ROBERT E. KEATING vs. STADIUM MANAGEMENT
CORPORATION.

Norfolk. February 18, 1987. — June 2, 1987.

Present: PERRETTA, DREBEN & WARNER, JJ.

*Contract*, Construction of contract, Performance and breach. *Evidence*,
Extrinsic affecting writing.

At the trial of a contract action, the judge properly received and considered
extrinsic evidence of the context of the agreement's execution, the estab-
lished business usage of the terms employed, and the performance of
the parties in order to determine the meaning of a provision in the
contract that was ambiguous, not on its face but in its application to the
subject matter, where such evidence did not contradict or change the
terms of the agreement. [249-252]

CIVIL ACTION commenced in the Superior Court Department
on April 11, 1983.

The case was heard by *Joseph Fitzsimmons, Jr.,* J.

*Richard K. Donahue* for the defendant.

*John J. C. Herlihy (Karen M. Thursby* with him) for the
plaintiff.

WARNER, J. The essential facts are not in dispute; the admis-
sibility of evidence establishing them and their relevance are
contested. From 1971 to 1973 the plaintiff had been employed
as director of operations at Schaefer (now Sullivan) Stadium
in Foxborough, a facility leased and operated by Stadium Realty
Trust (Trust), the predecessor of the defendant. From 1975 to
1978, the plaintiff was likewise employed at the Meadowlands,
a New Jersey complex then consisting of a stadium and a horse
racing track. His responsibilities there included the procure-
ment of commercial advertising within the stadium and the
track. The plaintiff sold advertising space for Marlboro ciga-
rettes (Marlboro) at the Meadowlands to Philip Morris U.S.A.

(Philip Morris), after negotiating the transaction with one Vin Winer, the representative of Philip Morris charged with advertising for Marlboro in stadia throughout the United States. While working at the Meadowlands, the plaintiff sold about $800,000 of advertising space.

After a communication from the Trust in early 1976, the plaintiff began negotiating with Winer for Marlboro advertisements at Schaefer Stadium. The plaintiff also had prepared a leasing representation agreement (Agreement) and submitted it to the Trust. The Trust returned the proposed Agreement to the plaintiff with the addition of a paragraph numbered 4 (which will be discussed below); the plaintiff executed the Agreement. Thereafter, on April 9, 1976, the plaintiff met with the trustees of the Trust and presented a proposal, including blueprints and schematics, for Marlboro advertising within Schaefer Stadium. The trustees accepted the proposal and subsequently entered into a contract with Philip Morris having essentially the terms and conditions proposed by the plaintiff; the advertising was put in place. After the plaintiff made his proposal at the April 9th meeting, the managing trustee signed the Agreement on behalf of the Trust.

The Agreement contained the following relevant provisions: (1) The plaintiff was retained as a nonexclusive representative to solicit leases for space for commercial advertising "in or about" Schaefer Stadium. (2) For the initial term of each such lease obtained by the plaintiff, he would be paid a commission of fifteen percent of rental payments received and for extensions or subsequent leases, the commission would be ten percent. (3) Either party could terminate the Agreement (otherwise self-extending) on thirty days' written notice prior to the expiration of a one-year term. The core of the dispute in this case lies in paragraph 4, which, as we have said, was added by the Trust to the proposed Agreement submitted by the plaintiff. That paragraph provides:

> "Notwithstanding any provision herein to the contrary, Keating shall not be entitled to commissions on account of rentals received by the Trust from any business which

now leases, or has in the past leased, space at the Stadium for commercial advertising use *or which has in the past purchased advertising space or time from any lessee of the Trust"* (emphasis supplied).

The plaintiff was paid the proper commissions under the Agreement from 1976 through 1981. In late 1981, the defendant succeeded the Trust and assumed all the latter's rights and obligations under the Agreement. On March 6, 1982, the defendant gave the plaintiff timely notice of termination of the Agreement. The plaintiff's attorney responded on March 17, 1982, by acknowledging the propriety of the termination but insisting that the plaintiff would be entitled to future commissions under the terms of the Agreement so long as Philip Morris continued to display advertisements in and around Schaefer Stadium. On August 7, 1982, Charles W. Sullivan, president of the defendant, replied that the plaintiff would not be entitled to such commissions, by virtue of the terms of paragraph 4 of the Agreement, as Philip Morris, before the Agreement, had purchased advertising space in the team program from the New England Patriots Football Club, Inc., a sublessee of the Trust. Prior to April 9, 1976 (the date of the Agreement), the Patriots had engaged National Football League Properties, Inc., as its agent to sell advertising in PRO!, a football game program. There had been a full page advertisement for Marlboro in the August 15, 1971, program, the date of the first game played by the Patriots at Schaefer Stadium, and similar advertising in subsequent issues.

In November of 1982, the defendant entered into a new lease arrangement (ongoing at the time of trial) with Philip Morris for in-stadium advertising of Marlboro at the rate of $150,000 per year. The plaintiff has received no commissions under the Agreement since 1981.[1]

---

[1] It is undisputed that, if the plaintiff was entitled to commissions on payments under the original arrangement for Marlboro advertising, he is entitled to renewal commissions on payments under the 1982 lease.

The plaintiff's amended complaint sought damages for breach of contract and under G. L. c. 93A, § 11, and a declaration (G. L. c. 231A, § 1) that the defendant had a duty to pay the plaintiff a ten percent commission on rental payments under the 1982 lease for Marlboro advertising. The defendant counterclaimed for the commissions paid from 1976 through 1981. After a jury-waived hearing in the Superior Court, a judge made findings of fact and rulings of law, and a judgment was entered (1) dismissing the defendant's counterclaim, (2) awarding contract damages ($60,000) for commissions under the terms of the Agreement on the rental payments under the 1982 lease,[2] and (3) declaring that the plaintiff is entitled under the Agreement to ten percent commissions on the 1982 lease payments and on payments pursuant to any extended or subsequent lease with Philip Morris. The defendant appealed.

On appeal the defendant argues, as it did at trial, that it was error for the judge to receive and consider extrinsic evidence as to the meaning of the Agreement, particularly the provisions of paragraph 4. This is so, the defendant contends, because the relevant language of the Agreement is clear and unambiguous; indeed, the parties stipulated (and the judge by remark at trial seemed to agree) to that conclusion. There was no error.

The judge's findings and rulings make clear that he construed the disputed language of paragraph 4 of the Agreement considering the context in which the Agreement was executed, the established business usage of terms employed and the performance of the parties. The judge did not stray from the application of correct legal principles.

Contrary to the defendant's argument, the language of a contract need not be ambiguous on its face in order that extrinsic evidence may be admitted. "When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms. . . . Expressions

---

[2] The judge denied relief under G. L. c. 93A, and the plaintiff has not appealed.

in our cases to the effect that evidence of circumstances can be admitted only after an ambiguity has been found on the face of the written instrument have reference to evidence offered to contradict the written terms" (citations omitted). *Robert Indus., Inc.* v. *Spence,* 362 Mass. 751, 753-754 (1973). See *Computer Syss. of America, Inc.* v. *Western Reserve Life Assur. Co.,* 19 Mass. App. Ct. 430, 434 n.5 (1985); 3 Corbin, Contracts § 572B (1960 & Supp. 1971); Restatement (Second) of Contracts § 212(1) and comment b, and § 214 (1981). "[T]he facts and circumstances of the transaction, including the situation and relations of the parties, [may be admitted] for the purpose of applying the terms of the written contract to the subject matter and removing and explaining any uncertainty or ambiguity which arose from such application." *Robert Indus., Inc.* v. *Spence, supra* at 753. See *Rosen* v. *A-H, Inc.,* 17 Mass. App. Ct. 126, 128-129 (1983).[3]

We think that the controlling language of paragraph 4 of the Agreement — "any business . . . which has in the past purchased advertising space or time from any lessee of the Trust" — is, when applied to the subject matter of the Agreement, ambiguous. The language fails to give clear indication whether the exclusion of commissions related only to businesses which had purchased in-stadium advertising space or time at Schaefer Stadium prior to the date of the Agreement or whether the exclusion also applied to businesses which had purchased print media advertising. The judge properly resolved that ambiguity by resort to extrinsic evidence.

The evidence and fair inferences therefrom support the following. The Trust was seeking commercial in-stadium advertising for Schaefer Stadium. The plaintiff had experience in the specialized field in which few were engaged and had successfully attracted Philip Morris to the Meadowlands. It was

---

[3] The parties' stipulation and the judge's apparent acquiescence that the relevant language of the Agreement is clear and unambiguous are of no significance as the parties "appear to have agreed that the [Agreement] was not ambiguous only because each felt that it had a different clear meaning." See *Computer Syss. of America, Inc.* v. *Western Reserve Life Assur. Co., supra* at 434 n.5.

only after the trustees of the Trust had heard and accepted the plaintiff's detailed proposal for in-stadium Marlboro advertising that the trustees signed the Agreement. Marlboro advertisements had regularly appeared in PRO!. The Agreement had been prepared on behalf of the plaintiff and its provisions leave no doubt that the plaintiff's undertaking was only to secure commercial in-stadium advertising. Paragraph 4 of the Agreement had been drafted on behalf of the Trust. See *Merrimack Valley Natl. Bank* v. *Baird,* 372 Mass. 721, 724 (1977) ("As a general rule, a writing is construed against the author of the doubtful language . . . if the circumstances surrounding its use and the ordinary meaning of the words do not indicate the intended meaning of the language" [citations omitted]). A fair inference may be drawn that that paragraph also deals exclusively with in-stadium advertising.

There was uncontroverted testimony that established business usage of the term "space" advertising referred to advertising appearing on signs in the stadium and the term "time" advertising referred to advertising purchased by seconds or minutes on a message board (a message board was in place at Schaefer Stadium when the Agreement was executed). Neither term encompassed advertisements appearing in print media.

The judge could properly conclude from a reading of the entire Agreement, the circumstances attending its execution and the established business usage of terms that it was more probable than not that the intent of the parties, as expressed in paragraph 4, was to exclude commissions to the plaintiff only in the case of businesses which had leased or purchased in-stadium commercial advertising space or time at Schaefer Stadium prior to the date of the Agreement.

Any lingering doubt as to the proper construction of paragraph 4 is dispelled by consideration of the performance of the parties to the Agreement. "'There is no surer way to find out what parties meant, than to see what they have done.'" *Martino* v. *First Natl. Bank,* 361 Mass. 325, 332 (1972), quoting from *Pittsfield & North Adams R.R.* v. *Boston & Albany R.R.,* 260 Mass. 390, 398 (1927). "To enable us to understand the subject matter of the agreement, to the extent it is doubtful or ambiguous, we resort to the conduct of the parties to determine 'the

meaning that they themselves put upon any doubtful or ambiguous terms . . ..' " *Lembo* v. *Waters*, 1 Mass. App. Ct. 227, 233 (1973), quoting from *Rizzo* v. *Cunningham*, 303 Mass. 16, 21 (1939). See *C.K. Smith & Co.* v. *Charest*, 348 Mass. 314, 319 (1965); Restatement (Second) of Contracts § 202(4) (1981). Here, commissions were paid by the Trust without reservation under the terms of the Agreement. It was only after the defendant assumed the rights and obligations of the Trust, and about the time (the summer of 1982), according to the testimony of the defendant's president, Charles W. Sullivan, that Sullivan was negotiating with Philip Morris for a new advertising arrangement for Marlboro, that there was asserted by Sullivan a sudden change in the interpretation of paragraph 4.

Finally, the construction which the judge adopted, and which we approve, "is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It [interprets the Agreement] as a business transaction entered into by practical men to accomplish an honest and straightforward end. . . . [It recognizes that] [e]very contract implies good faith and fair dealing between the parties to it" (citations omitted). *Clark* v. *State St. Trust Co.*, 270 Mass. 140, 153 (1930). See *Shane* v. *Winter Hill Fed. Sav. & Loan Assn.*, 397 Mass. 479, 483 (1986), and cases cited; *Fay, Spofford & Thorndike, Inc.* v. *Massachusetts Port Authy.*, 7 Mass. App. Ct. 336, 344 (1979).

*Judgment affirmed.*