Botsford, J.

Introduction

The plaintiff Lexington Insurance Company (Lexington) seeks a declaratory judgment concerning its obligation to indemnify or defend a Newton-Wellesley Hospital nurse, the defendant Madeleine Loan, R.N., with respect to a judgment entered against her in 1998 in Middlesex Superior Court. At issue is an excess claims-made liability policy issued to the defendant Newell Health Care Systems, Inc. (Newell) which was in effect from January 1994 to January 1995 and under which the defendant Newton-Wellesley Hospital (Newton-Wellesley, or the hospital) and Nurse Loan were also insured. Presently before the court is Lexington’s motion for summary judgment against all three defendants. For the reasons discussed below, Lexington’s motion is denied.

Background

The following facts are undisputed for purposes of the summary judgment motion. From the end of 1987 to January 1996, Lexington provided excess or umbrella insurance to Newton-Wellesley[2] to supplement its primary insurance coverage, including its primary professional liability coverage. The umbrella coverage provided by Lexington applied to professional liability claims against nurses employed by Newton-Wellesley. The policies were annual ones, and Newton-Wellesley paid annual premiums ranging from $195,000 to $251,470 to Lexington. At issue in this case is the umbrella liability policy, No. 510-8566 (the policy), which Lexington issued to cover the period from January 13, 1994 to January 13, 1995. With respect to professional liability claims, the policy provides claims made excess coverage in connection with Newton-Wellesley’s primary policy issued by Massachusetts Medical Professional Insurance Association (MMPIA). The MMPIA policy in turn offers claims made coverage for the same 1994-1995 period, and has a limit of $2 million for each occurrence.
On May 2, 1991, Stacy Lucas gave birth to Krista Lucas at Newton-Wellesley. Before her discharge from the hospital, Krista Lucas developed jaundice, which allegedly was not treated. Within several days of her birth, the child allegedly developed a condition known as kernicterus, which has left her with cerebral palsy, deafness and an inability to walk or talk. The Lucas family brought suit in April 1994 against Newton-Wellesley, Nurse Loan and other persons who provided care to Krista Lucas after her birth. (Devin Lucas, et al. v. Louisa Stigol, M.D., et al., Middlesex Superior Court, C.A, No. 94-1888.) The case went to trial before a jury beginning on January 22, 1998. On February 6, 1998, apparently the last day of testimony, Newton-Wellesley’s insurance broker faxed a letter to Lexington concerning the case, the ongoing trial, and the fact that testimony had been offered quantifying the “economic value” of the case for the plaintiffs at approximately $7.5 million, without consideration of pain and suffering.[3] On February 11,1998, the jury returned a verdict against Nurse Loan in the amount of $7.175 million. MMPIA has paid the $2 million limit of its policy.
Lexington contends that Newton-Wellesley’s failure to submit proper notice of the Lucas incident precludes coverage under the policy as a matter of law. Newton-Wellesley responds that it was not obligated to report the Lucas incident under the terms of the policy, and that even if it were, the parties had agreed on the submission of certain “loss run” reports prepared by the primary insurer, MMPIA, as a substitute for written notice of claims. Newton-Wellesley’s position is that there are material issues of fact in dispute in this case.

*407
Discussion

The Lexington policy differentiates between the notice requirements for an “occurrence” and a “claim,” although Lexington conflates the two in its argument. It is not entirely clear whether Lexington is arguing a failure of notice on Newton-Wellesley’s part because there was no notice of the Krista Lucas “occurrence,” or because there was no notice of the Lucas family “claim,” or both.[4] I will assume that Lexington intends to raise both issues.
With respect to an “occurrence,” it helps to begin with the definition. The term is defined, for purposes of professional liability insurance — the type at issue in this case — as follows: “Occurrence” shall mean any negligent act, error or omission resulting in a claim made during this policy period. All claims arising out of the same negligent act, error or omission shall be considered as arising out of one occurrence." (Lexington Concise Statement of Material Facts, Exhibit A [Lexington Ex. A] at ARSMA 0073.)[5] Under the terms of Endorsement # 0012, entitled “claims reporting endorsement,” Newton-Wellesley is obligated to “give written notice immediately” whenever a patient or visitor suffers an injury on account of an “occurrence” when the “occurrence” results in:
“A. unanticipated neurological, sensory and/or systematic deficits-brain damage, permanent paralysis including paraplegia and quadriplegia [sic.], partial or complete loss of sight, hearing or smell, kidney failure or sepsis; . . .
F. extended disability of six months or more . . .
(Lexington Ex. A. at ARSMA 0085.)
Lexington maybe arguing that under this provision, Newton-Wellesley was obligated to give immediate notice of Krista Lucas’ injuries, which would appear to mean that notice should have been given in or around May 1991, when the injuries allegedly occurred. If this is Lexington’s contention, summary judgment cannot be granted because under another endorsement to the policy,[6] Newton-Wellesley was not required to give notice of an occurrence to Lexington until the hospital’s senior vice president of finance or risk manager was made aware of the occurrence — which in this case did not happen until the Lucas lawsuit was filed in April 1994. In other words, if there was an obligation to give notice of an “occurrence” related to Krista Lucas, it may well have arisen at the same time as the obligation, if any, to give notice of the Lucas “claim.” [7] At the very best, from Lexington’s perspective, there are material issues of fact in dispute on the point.
There are also disputed issues of fact concerning the notice requirements for “claims” unde- the policy, or more particularly, concerning Newton-Wellesley’s compliance with those requirements. Endorsement #0012 requires immediate written notice “of all claims that are reserved at 50% of the self-insured retention or underlying limit of liability and/or verdict potential of 75% of the self-insured retention or underlying limit of liability.” (Lexington Ex. A at ARSMA 0085.)[8] Under the notice provision in the general conditions of the policy — if it applies to Newton-Wellesley (see note 7 above) — the hospital was to give immediate written notice “of any claim, alone or in combination with any other claims, to which this policy applies which may exceed 25% of the applicable amount set forth in the Schedule of Underlying Insurance ...” (Lexington policy, “Conditions,” ¶4, Lexington Ex. A at ARSMA 0065.) The underlying MMPIA policy had a $2 million limit, and MMPIA set reserves on the four Lucas claims (Krista Lucas, her two parents, and her brother) at $25,000, $10,000, $10,000 and $5000 respectively, for a total of $50,000. Whether considered alone or in combination, these reserves do not come close to 50% of the MMPIA policy limit. The Lexington policy does not appear to provide any direction to Newton-Welles-ley, as the insured, concerning how it was to deter mine whether a claim might exceed 75% (or 25% if the general notice provision is applicable) of the underlying insurance limit, or when that determination was to be made. Certainly I am not in a position to state as matter of law that in the absence of instructions from the insurer on the point, the hospital unreasonably relied on the reserves set by its primary insurer as an estimate of its potential liability in the Lucas suit — at least until the reserves were changed or something happened to put Newton-Wellesley on notice that the reserves were wholly inadequate to deal with the liability risk, but Lexington has presented no evidence on either of these two possibilities. If Newton-Wellesley could permissibly base its evaluation of the potential liability on the reserves set by MMPIA, then there was no obligation to give Lexington notice of the Lucas claim when the suit was filed, or by any point in time that Lexington has identified. Again, at the very least, there are material factual disputes relating to Newton-Wellesley’s obligation to notify Lexington of the Lucas claim. Summary judgment in Lexington’s favor must be denied.
Moreover, as Newton-Wellesley points out, even if it was required to give notice of the Lucas claim to Lexington before 1998, there are factual disputes about whether it did so in a way that Lexington had previously agreed was sufficient, namely, through the submission in December 1994 of the MMPIA “loss rim” report.[9] Lexington argues that as matter of law, the loss run report, which was submitted in connection with Lexington’s policy renewal application for 1995, was not sufficient notice. Lexington relies in particular on W.R. Grace & Co. v. Maryland Cas. Co., 33 Mass.App.Ct. 358, 368-369 (1992), but also cites a number of cases from other jurisdictions. The W.R. Grace case was decided under New York rather than Massachusetts law, but the distinction is not dispos-itive. The more fundamental difficulty with Lexington’s position is that there is nothing in the W.R. Grace case, or others cited, to suggest the existence of a factual *408 dispute concerning the adequacy of notice. Newton-Wellesley does not argue here that loss run reports automatically qualify as adequate notice. Its point is that in this particular case, there is evidence — supplied in significant part by Pamela Haughawout, who was negotiating the policy terms with Lexington on behalf of Newton-Wellesley — that the parties agreed the loss runs would serve as notice of claims.[10] Factual questions about this issue preclude summary judgment.

ORDER

For the foregoing reasons, the motion for summary judgment of the plaintiff Lexington Insurance Company is denied.

 For some or all of those years, the actual named insured may have been Newell; Newell was the named insured for the policy in effect from 1994-1995. The distinction is irrelevant for purposes of this case. There is no question that Newton-Wellesley is insured under the Lexington excess policies. For purposes of this motion, I consider Newton-Wellesley as the named insured, and make no further references to Newell.

 There is no dispute this letter was sent. Lexington asserts this letter was the first notice it received of the Lucas claim; Newton-Wellesley disagrees with this assertion. The issue is discussed below.

 The confusion is illustrated by the first full paragraph on page 10 of Lexington’s memorandum, which discusses the notice requirements for an “occurrence” and for a “claim” without any real distinction between them.

 This definition builds in a certain degree of ambiguity. It appears by its terms to indicate that a negligent act, error, or omission does not qualify as an “occurrence” until it has resulted in a claim during the policy period. If this is so, then notice of the “occurrence” and notice of the claim would presumably be required at the same time. Perhaps this explains Lexington’s combined discussion of the notice requirements for an “occurrence" and a “claim.”

 See endorsement #0005 of the policy, Lexington Ex. A at ARSMA 0078.

 Another difficulty arises with respect to the claimed obligation to give notice of an occurrence. The Lexington policy contains a notice provision in its general conditions (see Lexington policy, “Conditions,” ¶4, Lexington Ex. A at ARSMA 0065). This provision states, inter alia, that notice is to include ”... how, when and where the occurrence took place; and . . . the names and addresses of any injured persons and any witnesses.” (Id.) It is not clear to me whether insofar as professional liability coverage is concerned, this general notice provision is superseded by endorsement #0012, the “claims reporting endorsement," which contains some of the same terms as the general notice provision, but not the two immediately quoted above. If the general notice provision is operative, the information contained in the loss runs (discussed in relation to the policy’s notice of claim requirement below) appears substantially to satisfy these two conditions.

 Neither side explains the “self insured retention” reference in Endorsement #0012. There appears to be a self insured retention of $10,000 with respect to the Lexington policy, and it appears to apply to losses not covered by any underlying insurance. (See Lexington Ex. A at ARSMA 0053.) Since the Lucas verdict was covered by the MMPIA insurance, I infer that the reference to “self insured retention” in Endorsement #0012 is inapplicable in this case.

 The “loss run” report was prepared by MMPIA as the primary insurance carrier. The report lists individually the claims against Newton-Wellesley, describes each briefly and states the reserve set for the claim.

 The negotiations about which Haughawout was testifying occurred in February 1991, three years before the policy at issue in this case went into effect. However, Lexington has not indicated any disagreement with Newton-Wellesley’s position that (1) Lexington had been providing excess claims made insurance coverage since 1988 to the hospital, and while policy periods were one year, negotiations between the parties about policy terms occurred on an ongoing basis and (2) agreements reached in 1991 through negotiations might well continue to apply to later policies. Lexington does argue in effect that the policy represents an integrated document and no extrinsic evidence concerning the parties’ understanding and intent should be considered. I disagree. As discussed above, the notice provisions of the Lexington policy are indeed somewhat ambiguous, and, in relation specifically to the notice of claim provisions, the policy leaves open how and when the insured is to determine if the claim may exceed 75% (or 25%) of the underlying insurance liability limit. In the circumstances, Newton-Wellesley is entitled to introduce extrinsic evidence that may serve to clarify or flesh out these terms. See, e.g. Keating v. Stadium Management Corp., 24 Mass. App. Ct. 246, 249-50 (1987).