722 A.2d 552 (1999)
317 N.J. Super. 406
INTEGRITY MATERIAL HANDLING SYSTEMS, INC., Plaintiff-Appellant,
v.
DELUXE CORPORATION and Paper Direct, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 1998.
Decided January 19, 1999.
*553 Donald J. Maizys, for plaintiff-appellant (Karas, Kilstein, Hirschklau, Feitlin & Youngman, Fair Lawn, attorneys; Mr. Maizys, on the brief).
Hugh P. Francis, Morristown, for defendant-respondent (Francis & O'Farrell, attorneys; Mr. Francis, of counsel, Peter A. Olsen, on the brief).
Before Judges PETRELLA and CUFF.
The opinion of the court was delivered by CUFF, J.A.D.
Plaintiff is a disappointed bidder for a contract to dismantle a private storage and distribution facility and to purchase and dispose of its equipment. It commenced an action to prevent defendants from selling the equipment to another and for damages. After its request for injunctive relief was denied, Judge Guida granted defendants' motion for summary judgment and dismissed plaintiff's complaint. On appeal, plaintiff contends that it presented ample evidence to raise a genuine issue of material fact concerning the existence of a contract. We affirm.
Our statement of facts reflects our consideration of the evidence in the light most favorable to the plaintiff, the party opposing summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995); Dairy Stores, Inc. v. Sentinel Publ'g Co., 104 N.J. 125, 135, 516 A.2d 220 (1986).
Plaintiff, Integrity Material Handling Systems, Inc., is in the business of dismantling and liquidating business equipment. In the Summer of 1996, defendant Deluxe Corporation decided to close the Lyndhurst warehouse and distribution facility of its wholly-owned subsidiary, defendant Paper Direct, Inc. To effectuate the closure, all stock had to be moved from the warehouse and all shelving and conveyor systems had to be dismantled and removed. Charles Pedrani, President of plaintiff, learned of the impending closure and met with representatives of defendant Deluxe, Larry Sieber and Ray Knapp, at the Lyndhurst facility on August *554 12, 1996. Also present was Ken Orchard of Norell Systems, Inc., who had informed Pedrani of the availability of the equipment.
Pedrani visited the site to view the equipment and to evaluate the resources needed to dismantle and remove it in accordance with defendants' timetable. During the facility inspection, Pedrani gave Sieber and Knapp a $100,000 oral quote to remove and purchase the equipment. According to Sieber, he emphasized to Pedrani that the equipment had to be dismantled by September 15, and removed by September 30. The meeting continued over dinner where the men discussed their respective responsibilities under the agreement.
On August 14, 1996, Pedrani and Orchard again met with Sieber at the Lyndhurst facility. They discussed the project and the timetable. After Pedrani assured Sieber that he could complete the job by September 30, he hand-wrote a purchase order for the three major items of equipment. The purchase order did not list the total price but did state "1/3 Dep 1/3 Down 1/3 Out." Pedrani gave Sieber a $34,000 check which Sieber took but did not negotiate.
During the August 14 meeting, Sieber introduced Pedrani to Bill Hall as a contractor employed by defendants to dismantle the facility. Pedrani and Hall talked for a while about removing the materials from the building. In his deposition, Hall stated that Sieber told him that Pedrani had the contract. Hall stated that he was worried about "the onset of litigation" after defendants reneged on the deal. Sieber told Hall that he had been "bullied" by Pedrani, a "big burly New Jersey guy," into accepting the check and handshake.
Later that day, Pedrani wrote a memo which he claims confirmed the agreement reached by Sieber and him. Significantly, two signature lines were placed on the document: one for Pedrani's signature on behalf of plaintiff and one read "Acceptance by Deluxe Corporation." This document was never signed by defendants.
As to other events of August 12 and 14 and their significance, the parties disagree. According to Sieber, he and Knapp informed Pedrani that a written contract would have to be executed, and it would not become binding until the entire proposal was reviewed and approved by the engineering and legal staffs in Minnesota. Sieber claimed further that Pedrani did not object to this and understood that several other firms had submitted competing bids. According to Pedrani, he was told that a decision would be reached within a few days and he believed that Sieber and Knapp were comfortable with his proposal. Pedrani claimed that nobody informed him that the legal department in Minnesota had to approve the agreement.
Pedrani also contends that he and Sieber shook hands on August 14 which signified to him the conclusion of an oral contract. Sieber denied shaking hands with Pedrani and claimed that an oral contract was never reached because Pedrani knew that he needed approval from the home office. Furthermore, Sieber notes that the purchase order was handwritten solely by Pedrani and was never signed by Sieber.
Sieber asserted that Pedrani insisted that he accept the check and that he did so reluctantly. Sieber stated that he considered the check simply a show of good faith and never cashed it. He claimed that before he took the check, he again told Pedrani that the agreement would not be finalized until a written proposal was reviewed and approved by the home office. Orchard testified that he never heard Sieber say anything about needing approval from Minnesota.
On August 15, 1996, Sieber and Knapp returned to Minnesota. At the home office, the Engineering Department told them that if the Lyndhurst facility was not vacated by September 30, defendants would incur an additional month's rent of $70,000. A determination was made that any agreement to liquidate defendants' Lyndhurst facility had to contain a $70,000 penalty clause.
Subsequently, Sieber called Pedrani and informed him that any deal had to include a penalty clause. Pedrani was surprised at this development and stated that a bonus clause for timely completion should also be added. Sieber claimed that Pedrani talked about lowering the amount of the penalty and *555 adding a bonus of $15,000 for timely completion.
During this period, defendants received a higher bid from East Coast Storage Systems. This company also agreed to the $70,000 penalty provision. On August 19, 1996, Sieber informed Pedrani of the other bid, but Pedrani refused to accept the agreement with the penalty provision. On August 20, Pedrani spoke to Knapp who told him that defendants would not accept an agreement without the clause. On August 21, Sieber called Pedrani and left a message that defendants had accepted the competing bid. He asked whether Pedrani wanted the check returned or destroyed.
On August 30, 1996, plaintiff filed a Verified Complaint for breach of contract and an Order to Show Cause seeking to restrain defendants from completing the contract with East Coast Storage Systems. After plaintiff's request for injunctive relief was denied, discovery proceeded and defendants subsequently moved for summary judgment.
In opposition, plaintiff argued that the parties had reached an agreement but conceded there was no writing to satisfy the Statute of Frauds. However, plaintiff argued the oral contract was valid because it fell within either of two exceptions to the Statute of Frauds, N.J.S.A. 12A:2-201(3)(b) (admission of contract) and (c) (part performance). Plaintiff also asserted that this agreement was a contract for the provision of services rather than a sale of equipment; therefore, Article 2 of the Uniform Commercial Code (UCC), N.J.S.A. 12A:2-101 through -725, did not apply to this transaction.
Judge Guida granted defendants' motion. He found that "the evidence suggests no more than an offer was made by [plaintiff] to purchase and remove the equipment from defendant's Lyndhurst warehouse." The judge concluded that Sieber did not admit to the contract's existence and did not accept the check in the normal course. By implication, the court decided the agreement was for the sale of goods.
As a preliminary matter, we reject plaintiff's argument that the transaction between the parties is not governed by the UCC and specifically its Statute of Frauds, N.J.S.A. 12A:2-201. When a contract is a mixed contract for goods and services, a court must determine whether the sales or services aspect predominates. Custom Communications Eng'g, Inc. v. E.F. Johnson Co., 269 N.J.Super. 531, 537, 636 A.2d 80 (App. Div.1993). See also Huyler Paper Stock Co. v. Information Supplies Corp., 117 N.J.Super. 353, 360, 284 A.2d 568 (Law Div.1971). To make this determination, courts look to the language and circumstances surrounding the contract, the relationship between the goods and services, the compensation structure and the intrinsic worth of the goods provided. Quality Guaranteed Roofing, Inc. v. Hoffmann-La Roche, Inc., 302 N.J.Super. 163, 166-67, 694 A.2d 1077 (App.Div.1997). Although this determination is a factual issue, the record in this case allows no other conclusion than that the dismantling service was tangential to the primary purpose of the transaction, acquisition of the shelving and conveyor system for resale by plaintiff at a substantial profit.
Having concluded that a writing was required to form the contract, N.J.S.A. 12A:2-201(1), we must decide whether the acts of the parties, either by acknowledgement of the existence of the contract or part performance, allow enforcement of an oral agreement. In the context of a summary judgment motion, we conduct this analysis in accordance with the standard set forth in Brill, supra.
Brill instructs us how to determine when an alleged disputed issue of fact should be considered genuine for purposes of R. 4:46-2. The Court emphasized that a motion judge should evaluate the evidence in the same manner as a motion for a directed verdict at the end of a plaintiff's case at trial, R. 4:37-2(b), and observed that the essence of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brill, supra, 142 N.J. at 536, 666 A.2d 146 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)). Measured against this standard, we conclude that plaintiff *556 failed to raise a genuine issue of material fact of acknowledgment of the contract by defendants or partial performance by plaintiff.
The Statute of Frauds provides:
Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

[N.J.S.A. 12A:2-201(1).]
Plaintiff does not dispute that there was not a sufficient writing to satisfy the Statute of Frauds, or that neither the purchase order nor the confirmatory correspondence remitted by plaintiff was ever signed by defendants. Plaintiff claims that the contract was enforceable because it fell outside the Statute of Frauds based on either of two exceptions. The relevant part of the statute reads:
(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable.

* * *
(b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or
(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (12A:2-606).

[N.J.S.A. 12A:2-201(3)(b), (c).]
The Statute of Frauds is a controversial rule first adopted by the English Parliament in 1677 and eventually adopted in early American common law. See N.J.S.A. 12A:2-201, New Jersey Study Comment. While some commentators believe the statute prevents fraud, others contend that it aids in the perpetration of fraud. Ibid. The drafters of the UCC, believing that the statute did more good than harm, retained the writing requirement for the sale of goods over $500 subject to certain exceptions. Ibid.
The exceptions to the Statute of Frauds set out in N.J.S.A. 12A:2-201(3)(b) & (c) contemplate the enforcement of certain oral contracts without a writing. See 1 James J. White and Robert S. Summers, Uniform Commercial Code, § 2-5 at 70 (4th ed.1995) (hereinafter White and Summers). For each exception, the plaintiff must prove the existence of a valid oral contract "plus something more." Ibid. This additional requirement of something more "is a kind of special indicator that a contract, albeit oral, was in fact made." Ibid.
Accordingly, to prevail under the exception set out in N.J.S.A. 12A:2-201(3)(b), plaintiff must prove the existence of a valid oral contract and must demonstrate that the defendant admitted that a contract was reached. To prevail under N.J.S.A. 12A:2-201(3)(c), the plaintiff must prove the oral contract and demonstrate that goods or payment were accepted by the defendant. To prevail under either exception, therefore, plaintiff must first demonstrate that an oral contract was reached.
For purposes of this opinion, we will assume that plaintiff has submitted sufficient evidence to raise a genuine issue of fact that the parties had reached agreement concerning most of the significant terms of the transaction. We conclude, however, that the evidence would not allow a rational fact-finder to find that defendants acknowledged the oral agreement.
The purpose behind the admission exception to the writing requirement is that "[t]he statute of frauds was not designed to protect a party who made an oral contract, but rather to aid a party who did not make a contract, though one is claimed to have been made orally with him." Cohn v. Fisher, 118 N.J.Super. 286, 296, 287 A.2d 222 (Law Div. 1972). Thus, when a party admits to making an oral contract, he should be held to this bargain. Ibid.
*557 Defendants never admitted the existence of a contract. Plaintiff's argument to the contrary and his attempt to discredit Sieber's testimony goes to whether an oral contract was ever reached, a prerequisite to invoking the exception to the Statute of Frauds. However, plaintiff submits no evidence of the "something more" contemplated by the statutory exception. An admission by defendants that an oral contract existed is lacking. Therefore, this exception is not available to plaintiff.
Similarly, the part performance exception to the Statute of Frauds is not available to plaintiff. The Uniform Commercial Code Comment to N.J.S.A. 12A:2-201 notes,
[p]art performance by the buyer requires the delivery of something by him that is accepted by the seller as such performance. Thus, part payment may be made by money or check, accepted by the seller.
The UCC "prohibits a party from invoking the Statute of Frauds defense if that party has received and accepted payment." First Valley Leasing, Inc. v. Goushy, 795 F.Supp. 693, 696 (D.N.J.1992); see also Buffaloe v. Hart, 114 N.C.App. 52, 441 S.E.2d 172, 176 (N.C.Ct.App.1994) (acceptance of check presents a question of fact). The agreement, however, is only enforceable with respect to the amount of goods for which payment has been accepted. N.J.S.A. 12A:2-201(3)(c). In other words, this exception "expressly limits enforceability only to the apportionable part ... for which seller has received and accepted payment...." See White and Summers, supra at 74.
White and Summers note the different results that have been reached in determining whether a down payment on a single nondivisible item indicates a contract permitting a party making the payment to prove and recover in full on the oral contract. Id. at 76. For instance, in Cohn, supra, the court held that a check for half of the agreed upon price given by the defendant-buyer to the plaintiff-seller could constitute partial performance of a contract to purchase a boat. Cohn, supra, 118 N.J.Super. at 296, 287 A.2d 222. The court noted that because the check was given to and accepted by the seller, the contract should, pursuant to N.J.S.A. 12A:2-201(3)(c), be held enforceable under the Statute of Frauds. Ibid. The court decided to uphold the entire contract because the agreement concerned the sale of only one boat. Id. at 297, 287 A.2d 222. Finally, the court held that the fact that defendant stopped payment on the check was of no legal consequence. Ibid.
Furthermore, in Cohn, the buyer had admitted to an oral contract, id. at 296, 287 A.2d 222, and had delivered a signed check describing the boat and stating its full price. Id. at 293, 287 A.2d 222. The court held that the check was sufficient to constitute a writing that satisfied the Statute of Frauds. Id. at 294, 287 A.2d 222.
On the other hand, in Jones v. Wide World of Cars, Inc., 820 F.Supp. 132, 136 (S.D.N.Y. 1993), the court held that a buyer's deposit towards the purchase of a car was insufficient to establish an enforceable contract absent additional conduct or a writing. The court noted, however, that cases under the Statute of Frauds have suggested that the recipient of a deposit, but not the buyer, may be bound. Id. at 137.
White and Summers cite approvingly cases in which acceptance of a deposit has rendered enforceable an entire oral agreement for a nondivisible item. White and Summers, supra, at 76. See The Press, Inc. v. Fins & Feathers Publ'g Co., 361 N.W.2d 171, 174 (Minn.Ct.App.1985) (upholding an oral contract where part payment was received for a two million piece print run); Morris v. Perkins Chevrolet, Inc., 663 S.W.2d 785, 787 (Mo.Ct.App.1984) ("partial payment for a single indivisible commercial unit validates an oral contract...."); Paloukos v. Intermountain Chevrolet Co., 99 Idaho 740, 588 P.2d 939, 944 (Idaho 1978) ("payment of $120, which was accepted ... though later returned, constitutes sufficient part performance to excuse compliance with the statute of frauds"). Here, however, the evidence is insufficient to support a conclusion that defendants ever accepted the down payment. The check was never cashed. In fact, there is no evidence that Sieber, the employee to whom Pedrani gave the check, ever submitted the check for negotiation. Of greater *558 significance, however, is that the single act of giving the check to Sieber, when viewed in context, allows no other conclusion than that Pedrani submitted the check as a sign of his interest and ability to do the job. This conclusion is directly supported by his deposition testimony in which he stated that the check was tendered to show his good faith as a bidder. His subsequent conduct of placing his offer in writing reinforces the conclusion that even Pedrani believed more was required to close his deal.
In summation, we conclude that the transaction between the parties involved a sale of goods which required a writing in order for the agreement to be enforceable. We also conclude that plaintiff failed to raise a genuine issue of material fact that defendants admitted or acknowledged the oral agreement or part performance by plaintiff to except this agreement from the writing requirement of N.J.S.A. 12A:2-201. Accordingly, defendants' motion for summary judgment was properly granted.
Affirmed.