LITHUANIAN COMMERCE
CORPORATION, LTD.,
Plaintiff,

v.

SARA LEE HOSIERY, Sara Lee Ho-
siery International, Sara Lee Interna-
tional and Sara Lee Corporation, De-
fendants,

v.

Algis Vasys and Laima Zajanck-
auskiene, Additional Coun-
terclaim Defendants.

Civil Action No. 96–1949.

United States District Court,
D. New Jersey.

July 30, 2002.

Gregory D. Saputelli, James R. Thompson, Eric G. Fikry, Obermayer, Rebmann, Maxwell & Hippel, LLP, Cherry Hill, NJ, for Lithuanian Commerce Corporation, Ltd.

Neil C. Schur, Stevens & Lee, P.C., Cherry Hill, NJ, Carl W. Hittinger, Donald E. Wieand, Stevens & Lee, P.C., Philadelphia, PA, for Sara Lee Hosiery and Sara Lee Corporation.

## OPINION

ORLOFSKY, District Judge.

Having prevailed on their motion for judgment as a matter of law in the first trial of this matter almost four years ago, Defendants, Sara Lee Corporation and Sara Lee Hosiery, ("Sara Lee"), now, at the close of Plaintiff, Lithuanian Commerce Corporation's ("LCC"), case upon retrial, have again filed a Rule 50(a) motion, hoping that history will repeat itself. Sara Lee has moved for judgment as a matter of law on seven distinct grounds. In its motion, Sara Lee asks this Court to apply well-established doctrines of contract law to the distinct factual circumstances presented here, to predict that the New Jersey Supreme Court would extend the economic loss doctrine to bar, without exception, all tort claims premised upon the same underlying transactions as concurrently pursued contract claims, and, to conclude that LCC has failed to present

"credible evidence" that Sara Lee engaged in fraudulent behavior, or acted in bad faith. For the reasons set forth below, I conclude that all but one of the grounds under which Sara Lee has moved for judgment as a matter of law, are without merit. I find that many of the legal principles which Sara Lee contends entitle it to judgment as a matter of law, would be inappropriately applied to the facts of this case. I further find that several of Sara Lee's arguments must be rejected because they would require me to weigh LCC's evidence and preempt the role of the jury, as the finder of fact in this case. Thus, I shall grant Sara Lee's Rule 50 motion on LCC's claim for breach of warranty for a particular purpose, N.J. Stat. Ann. § 12A:2–315, and deny the motion in all other respects.

## I. BACKGROUND

I have previously set forth the factual and procedural history of this case in considerable detail numerous times,[1] and therefore will not repeat that tortured history here. All that is necessary for an understanding of Sara Lee's current Rule 50 motion are the following facts. This case was previously tried four years ago, and concluded in this Court when I granted Sara Lee's first Rule 50 motion at the conclusion of LCC's case-in-chief. In granting that motion, I found that LCC had failed to present sufficient evidence regarding lost profits to permit the jury to award compensatory damages with reasonable certainty. *Lithuanian Commerce Corp. v. Sara Lee*, 23 F.Supp.2d 509 (D.N.J.1998). LCC appealed my decision to the United States Court of Appeals for the Third Circuit. In an unpublished opinion, the Third Circuit affirmed in part and reversed in part, finding that "there was competent evidence at trial which established damages arising from the alleged breach of the Settlement Agreement." *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, Nos. 99–5347 & 99–5742, slip op., at 16 (3d Cir. Sept. 11, 2000)[hereinafter *"Remand Opinion"*]. The Third Circuit vacated the judgment in favor of Sara Lee, and remanded this case for retrial in accordance with its Remand Opinion. *Id.* at 20–21. Since the parties could not agree about the scope of the trial on remand, I determined, in an unpublished opinion, dated February 13, 2002, that the Third Circuit's Remand Opinion permitted LCC to pursue its claims for breach of warranty under the Uniform Commercial Code ("U.C.C."); breach of the implied warranties of merchantability and fitness for a particular purpose under the U.C.C.; breach of contract; common law fraud; tortious interference with contract and prospective business relations; and, violations of the covenant of good faith and fair dealing. *Lithuanian Commerce Corp. v. Sara Lee*, Civ. A. No. 96–1949 (D.N.J. Feb. 13, 2002). Prior to trial, LCC voluntarily withdrew its claim for tortious interference with contract and prospective business relations. *See* Letter from Gregory D. Saputelli, Esq., dated June 21, 2002.

Once again, at the close of LCC's case-in-chief in this second trial, Sara Lee has moved for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50. Sara Lee

1. *See e.g., Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 202 F.Supp.2d 371 (D.N.J.2002); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 177 F.R.D. 205 (D.N.J.1997); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 177 F.R.D. 245 (D.N.J.1997); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450 (D.N.J.1998); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 23 F.Supp.2d 509 (D.N.J.1998); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 47 F.Supp.2d 523 (D.N.J. 1999); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, Civil Action No. 96–1949 (D.N.J. Oct. 5, 1998); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, Civil Action No. 96–1949 (D.N.J. Aug. 2, 1999).

argues that judgment as a matter of law is appropriate:

(1) on all of LCC's claims because LCC has failed to produce sufficient evidence to enable the jury to calculate LCC's damages with reasonable certainty;

(2) on LCC's claim for common-law fraud because the "economic loss" doctrine prohibits LCC from seeking recovery for fraud where an adequate contract remedy exists;

(3) on LCC's claim for common-law fraud because LCC has failed to produce any evidence of scienter or objectively reasonable reliance;

(4) on LCC's claim for punitive damages because LCC has failed to present clear and convincing evidence that Sara Lee acted with actual malice or in wanton or willful disregard of LCC's interests;

(5) on LCC's claim for breach of the implied warranty of merchantability, because the "predominant purpose" of the contract was a settlement of LCC's litigation claims, therefore the contract is not one for a sale of goods governed by Article 2 of the U.C.C.;

(6) on LCC's claim for breach of the implied warranty of fitness for a particular purpose because LCC has failed to produce any evidence that the pantyhose which are the subject of the contract were to be used for any "specialized" purpose; and,

(7) on LCC's claim for breach of the implied covenant of good faith and fair dealing because LCC has failed to establish that Sara Lee acted in bad faith.

## II. THE LEGAL STANDARD GOVERNING JUDGMENT AS A MATTER OF LAW UNDER FEDERAL RULE OF CIVIL PROCEDURE 50

■ Federal Rule of Civil Procedure 50 provides, in relevant part:

If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed.R.Civ.P. 50(a)(1). " '[A] directed verdict is mandated where the facts and the law will reasonably support only one conclusion.' " *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 88 (3d Cir.2000)(quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)). A Court may only grant judgment as a matter of law if after "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). "[T]he focus of [the] inquiry is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly base its verdict." *Villanueva v. Brown*, 103 F.3d 1128, 1133 (3d Cir.1997). " 'If the evidence is of such character that reasonable [persons], in the impartial exercise of their judgment may reach different conclusions, the case should be submitted to the jury.' " *Id.* (quoting *J.I. Hass Co., Inc. v. Gilbane Bldg. Co.*, 881 F.2d 89, 92 (3d Cir.1989)). "By such direction of the trial the result is saved from the mischance of speculation over legally unfounded claims." *Brady v. Southern R.R. Co.*, 320 U.S. 476, 480, 64 S.Ct. 232, 88 L.Ed. 239 (1943).

■ Furthermore, in ruling on a motion for judgment as a matter of law, the Court is not free to: (1) weigh the evidence, (2) pass on the credibility of witnesses, or (3) substitute its judgment of the facts for that of the jury. *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 113 (3d Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987); *Tripodi v. Johnson & Johnson,* 877 F.Supp. 233, 236 (D.N.J. 1995).

## III. DISCUSSION

### A. Reasonable Certainty in the Calculation of Damages

Sara Lee argues that it is entitled to judgment as a matter of law on all of LCC's claims because LCC has failed to present sufficient evidence to enable the jury to calculate LCC's damages with "reasonable certainty." Specifically, Sara Lee contends that the record "is entirely devoid of any evidence of either LCC's pre-recall sales of Mexican-made L'eggs product in 1995 or LCC's claimed recall of those pantyhose from the market in December 1995 (other than one internal order)," Def.'s Br. at 7, and therefore, Sara Lee contends that the jury cannot calculate the proper amount of "offset" in determining LCC's damages. Sara Lee focuses on the fact that LCC's evidence of its damages was predominantly in the form of in-house *summaries* of sales and returns of the Mexican-made pantyhose and on internal directives concerning those sales and returns, rather than on underlying invoices, which no longer exist. Def.'s Reply Br. at 5–15.

LCC counters that it has "presented detailed documentary evidence and oral testimony which establishes the disposition of all but 1,910 pairs of more than half a million pairs [of pantyhose] received from Sara Lee," and that the value of these missing 1,910 pairs represents less than 0.3% of the total product (510,360 pairs)

provided by Sara Lee. Pl.'s Br. at 7. Thus, LCC argues that it has proved damages "with greater than 99% certainty." *Id.* at 1. LCC points to the Third Circuit's Remand Opinion which held that "there was competent evidence at trial which established damages arising from the alleged breach of the Settlement Agreement," Remand Opinion at 19, and the Court of Appeals' conclusion that the evidence presented at the first trial established that the "[l]iquidation proceeds, ostensibly the actual value of the pantyhose (the discounted sale of the defective pantyhose), totaled $35,853.00." *Id.* at 20.

■ Under New Jersey law, once a plaintiff has established an injury, it need prove the amount of damages only to a reasonable degree of certainty. *Lightning Lube,* 4 F.3d at 1176 (citing *Tessmar v. Grosner,* 23 N.J. 193, 203, 128 A.2d 467 (1957)). Indeed, New Jersey courts have consistently held that: "[t]he rule relating to uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, mere uncertainty as to the amount will not preclude the right of recovery." *Tessmar,* 23 N.J. at 203, 128 A.2d 467; *accord Kozlowski v. Kozlowski,* 80 N.J. 378, 388, 403 A.2d 902 (1979)("While the damages flowing from defendant's breach of contract are not ascertainable with exactitude, such is not a bar to relief."); *American Sanitary Sales Co. v. Dep't of Treasury,* 178 N.J.Super. 429, 435, 429 A.2d 403 (App.Div.1981)("The ideal of a judicial system is perfect justice. However, in a case where, as here, absolute precision in fixing damages may not be attainable, we should not hesitate to seek essential justice. It would be a travesty to deny a plaintiff essential justice because the absence of means for precision precludes perfect justice."); *Sandler v. Lawn–A–Mat Chemical & Equip. Corp.,* 141 N.J.Super. 437, 454, 358 A.2d 805

(App.Div.1976)("Mere difficulty or lack of certainty in the proof or finding of the quantum of damages does not inhibit an award to the successful party.").

■ LCC's evidence of the liquidation proceeds it realized from the disposition of the Mexican-made pantyhose is based predominantly on in-house summaries of its sales and donations. Pl.'s Exs. 115; 115A; Tr. 2415–27. Sara Lee's observation that LCC has "lost" the invoices, receipts, and income records upon which these summaries were based is accurate. *See e.g.*, Tr. at 1591–97; 1600–09; 1623–43. This fact, however, does not lead inexorably to the conclusion that LCC has failed to produce evidence from which a jury could calculate damages to a reasonable degree of certainty. It only means that the jury will have to decide what weight, if any, should be accorded to these summaries in light of the fact that the underlying documentation upon which they are based no longer exists. Sara Lee's challenge to this evidence goes to the weight the summaries are to be given, and, therefore, is clearly an improper basis for granting judgment as a matter of law.

Sara Lee is, of course, free to argue to the jury that LCC's failure to retain the invoices and receipts upon which the summaries are based, in the face of pending litigation with Sara Lee, makes the summaries suspect and unworthy of belief. This conclusion, however, is not the only reasonable one that may be drawn from the from facts in evidence. It is also quite possible for the jury to conclude that LCC discarded the underlying documentation as part of its normal business operations, and that no adverse inference can be drawn from their unavailability.

LCC admits that it could not account for 1,910 pairs of the Mexican-made pantyhose with detailed documentation. Tr. 2417:22–2418:7. With regard to these 1,910 pairs, however, Mr. Vasys ("Vasys"), LCC's President, testified that the maximum amount LCC could have received for the liquidation of the unaccounted-for 1,910 pairs was $9,072.00. Tr. 2418:10–2419:19. Vasys arrived at this figure by multiplying 1,910 by the price per pair which LCC charged for the most expensive L'eggs pantyhose, that is, "Sheer Energy," which sold for $4.75 per pair. Vasys then projected a maximum possible liquidation value by adding the estimated value of the unaccounted-for 1,910 pairs ($9,072.00) to the known liquidation value of the remaining 508,450 pairs ($35,855.00). Thus, LCC has introduced evidence of a range of liquidation values from $35,855 to $44,927. Pl.'s Ex. 115A.

Although this evidence does not establish the liquidation value with exactitude, it does provide the jury with sufficient evidence to calculate the liquidation value of the Mexican-made pantyhose, and thus, to approximate to a "reasonable degree of certainty" the so-called "liquidation" offset to LCC's total amount of damages. Just as it is within the jury's province to decide what weight, if any, to give the summaries of sales which LCC introduced, so too it is the jury's duty to evaluate the credibility of Vasys's testimony concerning the liquidation proceeds of the 1,910 pairs of "unaccounted-for" pantyhose. Although some extrapolation and projection will be entailed in calculating the total damages, if any, suffered by LCC, the jury has been presented with sufficient evidence to enable it to make such calculations to a reasonable degree of certainty.

Accordingly, Sara Lee's motion for judgment as a matter of law on all of LCC's claims for failure to present evidence enabling the jury to calculate damages with reasonable certainty shall be denied.

## B. The Economic Loss Doctrine

Sara Lee acknowledges that the Third Circuit has, thus far, declined to predict

whether the New Jersey Supreme Court will extend the so-called "economic loss doctrine" to prohibit plaintiffs from pursuing a fraud claim based on the same set of facts arising out of a breach of contract claim. Def.'s Br. at 18 (citing *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 144 (3d Cir.2001)). Sara Lee nevertheless urges this Court to make such a prediction in order to conclude that LCC may not simultaneously pursue its fraud and contract claims based on the facts and circumstances of this case.

■ As the Third Circuit has observed: "the continuing validity of fraud claims in cases involving frustrated economic expectations under New Jersey law is very complex and troublesome." *Vanguard Telecommunications, Inc. v. Southern New England Tel. Co.*, 900 F.2d 645, 653 (3d Cir.1990). The following two legal principles relevant to this motion, however, are clear from the holdings of the New Jersey Supreme Court: (1) where "a tort cause of action for economic loss duplicat[es] the one provided by the U.C.C." the tort action should be barred as "superfluous and counterproductive," *Alloway v. Gen. Marine Indus.*, 149 N.J. 620, 641, 695 A.2d 264 (1997); but, (2) the U.C.C. does not completely supplant the rights of victims of fraud or unconscionable conduct to recover for common-law fraud or for violations of various state and federal statutes. *Id.* at 639–40, 695 A.2d 264; *see also Perth Amboy Iron Works v. Am. Home Assurance Co.*, 226 N.J.Super. 200, 216–18, 543 A.2d 1020 (App.Div.1988), *aff'd*, 118 N.J. 249, 571 A.2d 294 (1990).

District Courts in this Circuit have interpreted these pronouncements as requiring the conclusion that where the fraud alleged is contained within the four corners of the contract, that is, where it concerns the nonfulfillment of a warranty or a guarantee contained in the contract, the plaintiff is prohibited from pursuing a separate tort claim; but, where the fraud is extrinsic to the contract, that is, where it more closely resembles a "fraud in the inducement" claim, then the plaintiff is not prohibited from pursuing simultaneous tort and contract claims. *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F.Supp.2d 521, 528 (D.N.J.1998)(Walls, J.); *see also Lo Bosco v. Kure Eng'g Ltd.*, 891 F.Supp. 1020, 1032–33 (D.N.J.1995)(Wolin, J.); *Werner & Pfleiderer Corp. v. Gary Chem. Corp.*, 697 F.Supp. 808, 814–15 (D.N.J.1988)(Wolin, J.); *Unifoil Corp. v. Cheque Printers and Encoders, Ltd.*, 622 F.Supp. 268, 271 (D.N.J.1985)(Stern, J.)("This Court, moreover, has construed the law of New Jersey to prohibit fraud claims when the 'fraud contemplated by the plaintiff ... does not seem to be extraneous to the contract, but rather on fraudulent performance of the contract itself.'") (quoting *Foodtown v. Sigma Mktg. Sys., Inc.*, 518 F.Supp. 485, 490 (D.N.J.1980)). The *Florian* Court also indicated that it is relevant to inquire whether the parties expressly limited the remedies for breach in the contract. If they had, allowing the plaintiff to pursue a tort remedy would contravene the intentions of the parties. *Florian*, 11 F.Supp.2d at 528 ("To permit Florian to pursue tort remedies does not allow remedies beyond those embraced by the contract."). Furthermore, *Florian* notes that it would be contrary to the intent of the New Jersey legislature to foreclose unilaterally the unique remedies available under tort law, merely because a contract existed between the parties. *Id.* ("The state legislature intended persons who committed fraudulent commercial practices in connection with the sale of merchandise to be liable for treble damages. To hold that this statutory claim is subsumed by plaintiff's breach of contract cause of action would be contrary to legislative intent and would preclude consumer

fraud claims in far too many circumstances.").[2]

Here, LCC has presented sufficient evidence from which the jury could conclude that the fraud which LCC alleges that Sara Lee committed, induced LCC to enter into the Letter Agreement of July 7, 1995, through which LCC agreed to relinquish its legal claims against Sara Lee in exchange for the Mexican-made pantyhose. *See* discussion *infra*, III.C. Thus, I find it unnecessary to predict how the New Jersey Supreme Court would decide this issue, because I conclude that the facts of this case, which suggest an action for "fraud in the inducement," are controlled by existing pronouncements of the New Jersey Supreme Court and decisions of the District Courts of this Circuit. *See e.g., Alloway*, 149 N.J. 620, 695 A.2d 264; *Florian*, 11 F.Supp.2d 521; *Werner*, 697 F.Supp. 808; *Unifoil*, 622 F.Supp. 268. Furthermore, in this case, the contract between the parties does not explicitly limit the remedies available for breach. Thus, allowing LCC to pursue a tort remedy would not contravene the intent of the parties.

In support of its argument, Sara Lee points to the Third Circuit's decision in *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir.2002), in which the Third Circuit interpreted Pennsylvania law to bar fraudulent concealment claims based on the same underlying facts as a breach of warranty claim under Article 2 of the U.C.C. *Werwinski* presented a thorough analysis of national trends in the extension of the economic loss doctrine against the background of existing Pennsylvania law. While the Third Circuit found the arguments on both sides of the debate persua-

sive, it considered the fact that plaintiffs could be fully compensated under contract remedies to be dispositive in concluding that additional tort remedies were unnecessary, even for intentional torts. *Werwinski*, 286 F.3d at 679–80. This reasoning is not dispositive against the backdrop of New Jersey law, however, where the New Jersey legislature has determined that "persons who committed fraudulent commercial practices in connection with the sale of merchandise [could] be liable for treble damages" and subject to punitive damages. *Florian*, 11 F.Supp.2d at 528. Thus, I cannot predict that the New Jersey Supreme Court would extend the "economic loss doctrine" to cases, such as this one, where the fraud alleged more closely resembles a "fraud in the inducement" claim. To do so would foreclose plaintiffs from seeking special tort remedies specifically allowed by the New Jersey legislature.

Accordingly, I conclude under the facts and circumstances of this case that LCC may maintain its claims for both breach of contract and common-law fraud.

## C. Fraud: Lack of Scienter and Reasonable Reliance

To prove common-law fraud in New Jersey, a plaintiff must show: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the plaintiff rely on it; (4) reasonable reliance on the misrepresentation by the plaintiff; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350

2. Although I previously dismissed LCC's claim under the New Jersey Consumer Fraud Act, *Lithuanian Commerce Corp. v. Sara Lee*, 179 F.R.D. 450, 470 (D.N.J.1998), *Florian's* reasoning supports the conclusion that bar-

ring all common-law fraud claims where a contract between the parties exists, would likewise be contrary to the intent of the New Jersey legislature.

(1997); *Bilotti v. Accurate Forming Corp.*, 39 N.J. 184, 205–06, 188 A.2d 24 (1963).

■■■ Sara Lee contends that it is entitled to judgment as a matter of law on LCC's fraud claim because LCC has failed to produce evidence that Sara Lee knowingly misrepresented a material fact or that LCC reasonably relied upon Sara Lee's alleged misrepresentations. In support of this argument, Sara Lee contends that the only evidence which LCC has introduced that suggests that Sara Lee knew of the materially different specifications of the Mexican pantyhose is the equivocal testimony of LCC's witness, Vereen Mizelle ("Mizelle"). Sara Lee argues that Mizelle's conclusion that Sara Lee knew of the materially different specifications of the Mexican pantyhose was "unsupported by any facts, and, thus, was entirely conclusory and speculative." Def.'s Br. at 22.

LCC argues in opposition that it presented sufficient evidence to support a jury finding that Sara Lee made a knowing material misrepresentation of fact to LCC regarding the specifications of the Mexican-made pantyhose and that it is a question for the jury whether Vasys's reliance upon those misrepresentations was reasonable. *Id.* at 9.

LCC introduced evidence that Peter Hellebush ("Hellebush"), former President of Sara Lee Hosiery, represented to Vasys that "the specs [of the Mexican-made pantyhose] are exactly the same as they are in the U.S.," Pl.'s Ex. 76, that the Mexican-made pantyhose were not "irregulars" or "defective goods," but "first quality product." Tr. 901:22–903:7. LCC also introduced evidence that the specifications of the Mexican-made pantyhose were different from the specifications of pantyhose made in the United States. Tr. 1156:11–1157:25 (LCC's expert, Dr. Miller testifying that "The specifications were not the same. In other words, the actual dimensions of the product as they wanted them to be in this country and as they are made in Mexico were different."); Pl.'s Ex. 354J; Pl.'s Ex. 354K; Pl.'s Ex. 154 (memorandum from Joe Williams to Vereen Mizelle stating "These products [the Mexican-made pantyhose] are obviously not exact replicas of the same U.S. styles in all respects."). LCC also introduced evidence that Sara Lee did not reveal to LCC that the Mexican-made pantyhose had "fallen short from all expectations, to a large extent due to product dissatisfaction, . . .". Pl.'s Ex. 87, and that this information would have been material to the parties' agreement. *See* Tr. 920:20–922:4; *see also* Tr. 1096:23–1097:3. Thus, there is sufficient evidence in the record from which the jury could conclude that there was a material misrepresentation made about the specifications of the Mexican-made pantyhose.

LCC must also prove that Sara Lee knew of the falsity of the representations it made concerning the specifications of the Mexican-made pantyhose. Mizelle testified that he believed Herve Roche ("Roche"), the then-President of Sara Lee Hosiery Mexico, knew of the differences between the Mexican-made pantyhose and pantyhose made in the United States. Tr. 466:14–23. Sara Lee argues that Mizelle's testimony is insufficient to prove scienter because Mizelle used conditional terms such as "based on what I know now" and "I would suspect," in his testimony that Roche knew of the differences in the pantyhose. The effect such qualifiers have on the weight to be accorded to Mizelle's testimony is for the jury to determine, however, and cannot form the basis for granting a Rule 50 motion.

■■■ Additionally, Mizelle's testimony is not the only evidence which LCC introduced to support its contention that Sara Lee knew of the differences between the

Mexican and United States pantyhose. LCC also presented testimony from Hellebush that Roche told him that if he could not ship the Mexican-made pantyhose to LCC, he would have to "dig a hole and bury it" because he "was under pressure to make the transaction [the charge of the discontinuation of the L'eggs program in Mexico] on the books by the end of the fiscal year." Tr. 900:22–901:5. LCC also introduced a memo, which Roche received, Tr. 1108:4–19, that indicated the Mexican-made pantyhose had been taken off the market due to customer dissatisfaction. Pl.'s Ex. 87. Accordingly, there was sufficient evidence introduced by LCC from which a jury could reasonably conclude that Sara Lee, through Hellebush, Mizelle, and Roche, knew that the Mexican pantyhose were not "exactly the same as they are in the United States" and may not have been "first quality product."

Finally, Sara Lee argues that LCC has failed to prove that Vasys's reliance upon Sara Lee's representations about the Mexican-made pantyhose was reasonable. Def.'s Br. at 22–23. Vasys testified that he "absolutely relied on [the] representations and promises" made by Hellebush and Mizelle. Tr.1975:1–18; 1968:21–1969:22. Both Hellebush and Mizelle testified that they knew Vasys would rely on Sara Lee's representations about the quality and specifications of the Mexican-made pantyhose. Tr. 909:10–13; 709:18–20. Thus, LCC introduced evidence that Vasys relied upon Sara Lee's representations concerning the specifications of the Mexican-made pantyhose. The question of whether this reliance was "reasonable" is a question of fact for the jury. *Bonvie Stables, Inc. v. Irving*, 350 N.J.Super. 579, 589, 796 A.2d 899 (App.Div.2002); *Bell Atl. Network Svcs., Inc. v. P.M. Video Corp.*, 322 N.J.Super. 74, 96, 730 A.2d 406 (App. Div.1999).

### D. Punitive Damages

Sara Lee argues that it is entitled to judgment as a matter of law on LCC's claim for punitive damages because LCC has failed to present clear and convincing evidence of actual malice or wanton and willful disregard of LCC's interests, or to prove the elements that a trier of fact should consider under New Jersey's Punitive Damages Act, N.J. Stat. Ann. § 2A:15–5.12.

New Jersey's Punitive Damages Act provides, in relevant part:

> Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

N.J. Stat. Ann. § 2A:15–5.12(a).

■ "An award of punitive damages by a jury serves a twofold purpose: first to punish egregious misconduct, and second, to deter the offender, and others, from repeating it." *Mancini v. Township of Teaneck*, 349 N.J.Super. 527, 568, 794 A.2d 185 (App.Div.2002). The intent of the New Jersey Legislature in enacting the Punitive Damages Act was to establish more restrictive standards governing an award of punitive damages. *Smith v. Whitaker*, 160 N.J. 221, 247, 734 A.2d 243 (1999) (Garibaldi, J., concurring)(citing N.J. Stat. Ann. § 2A:15–5.9; Assembly Insurance Committee Statement, Senate, No. 1496 L.1995, c. 142). I now turn to an analysis of the evidence presented by LCC to support its claim for punitive damages.

### 1. Actual Malice or Wanton and Willful Disregard

 Mizelle testified that in response to an inquiry about what Sara Lee would do to remedy the deleterious effect Sara Lee's charitable donation of pantyhose to states neighboring Lithuania, had had on LCC's sales, Roche, then a Vice President in Sara Lee's International Department, responded: "Fuck him [Vasys], I don't give a shit about him." Tr. 376:9–10. Mizelle further testified that he believed Roche knew that the Mexican pantyhose were not made to the same specifications as pantyhose made in the United States at the time Roche suggested that the Mexican pantyhose be given to LCC in exchange for a release of its legal claims. Tr. 466:19–23. Such evidence, if believed by a jury, evinces actual malice or wanton and willful disregard of LCC's interests.

Sara Lee's efforts to distance itself from Roche's statements are unavailing. Although Sara Lee argues that Roche was not directly involved in negotiating the July 7, 1995 letter agreement through which LCC released its legal claims against Sara Lee, there was evidence, introduced by LCC, that it was Roche who suggested that the Mexican pantyhose be offered to LCC as consideration for releasing its legal claims against Sara Lee. Tr. 543:16–20. Thus, if this testimony is credited by the jury, Roche could be considered to have been instrumental in consummating the July 7, 1995 letter agreement by suggesting one of its key provisions.

### 2. Punitive Damages Act Factors

In determining whether punitive damages are warranted, the trier of fact should consider the following factors:

(1) The likelihood, at the relevant time, that serious harm would arise from defendant's conduct;

(2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;

(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and

(4) The duration of the conduct or any concealment of it by the defendant.

N.J. Stat. Ann. § 2A:15–5.12(b).

 With regard to the first and second of the four, nonexhaustive factors relevant to a jury's consideration of a punitive damage claim, Sara Lee argues that because the Mexican pantyhose were given to LCC free of charge, except for shipping charges, LCC's potential losses were minimal. Sara Lee's attempt to explain away the "elephant in the room," that is, LCC's release of its legal claims against Sara Lee in exchange for the Mexican pantyhose, is unpersuasive. Sara Lee suggests "[t]he fact that in consideration for this gift, LCC released its claim concerning the Russian donation, which claim was of dubious merit or value, does not change this analysis." Def.'s Br. at 29. Whether LCC's claims were of "dubious merit or value" is a question of fact for the jury, not for this Court, to determine on a Rule 50 motion. The release of legal claims, in exchange for goods, the quality of which may have been intentionally misrepresented, if proven, is an example of the type of serious harm contemplated by the Punitive Damages Act.

The second factor of the Punitive Damages Act requires a jury to consider a defendant's awareness that serious harm could result from its actions. LCC has introduced evidence, which, if credited by a jury, could support the conclusion that Sara Lee was aware, at the time the Mexican pantyhose were offered as consideration for LCC's release of its claims against Sara Lee, that the pantyhose had been the subject of customer complaints and thus, might not have value sufficient to

justify LCC's release of its claims. *See* discussion *supra* at III.C.

LCC has also produced evidence in support of the third and fourth factors under the punitive damages analysis. Hellebush placed LCC's account "on hold" and suspended shipments to LCC after LCC reported having problems with the Mexican-made pantyhose. Pl.'s Ex. 156. Hellebush also noted that LCC could not afford to sue Sara Lee. *Id.* Such evidence, if believed, could lead the jury to conclude that, after learning that its conduct had caused LCC harm, Sara Lee distanced itself from LCC and considered itself "safe" from attack because LCC could not afford to sue Sara Lee for whatever wrongs it believed Sara Lee had committed.

Thus, I conclude when "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference," LCC has introduced sufficient evidence that, if credited by the jury, could support an award of punitive damages against Sara Lee here.

Sara Lee argues that the deterrent effect of punitive damages in this case is minimal because the circumstances of this case involved unique events unlikely to be repeated. Such an argument, however, depends on a narrow definition of the conduct which punitive damages are designed to deter. It is indeed unlikely that Sara Lee will again be asked to come to the aid of a business partner who had been harmed by a charitable contribution of goods to a neighboring market. It is not unlikely, however, that Sara Lee will, in the future, encounter a situation where it might take advantage of its status as a corporate "Goliath" to the disadvantage of a smaller "David."

Whether Sara Lee arrogantly engaged in the type of corporate overreaching that would be deterred by an award of punitive damages is for the jury to determine after carefully weighing the testimony and assessing the credibility of witnesses. Having concluded that LCC presented sufficient evidence to support a reasonable finding of such behavior, it would be inappropriate to grant Sara Lee's motion for judgment as a matter of law on LCC's claim for punitive damages. Accordingly, Sara Lee's motion for judgment as a matter of law on LCC's claim for punitive damages shall be denied.

### E. Article 2 of the U.C.C.

 Sara Lee argues that because the "predominant purpose" of the July 7, 1995 letter agreement between LCC and Sara Lee was the settlement of all claims LCC had against Sara Lee, it is not a contract for the sale of goods within the meaning of Article 2 of the U.C.C., and therefore, LCC cannot benefit from Article 2's implied and express warranties. In support of its argument, Sara Lee cites one case from the Federal Circuit, *Novamedix, Ltd. v. NDM Acquisition Corp.*, 166 F.3d 1177, 1181 (Fed.Cir.1999) and one case from the First Circuit, *ITT Corp. v. LTX Corp.*, 926 F.2d 1258 (1st Cir.1991). I find Sara Lee's argument unpersuasive for several reasons.

First, neither *Novamedix* nor *ITT* is controlling authority in this Circuit, and my independent research has yielded no such authority. Thus, I may certainly consider the Federal and First Circuits' analyses of this question, however, I am not bound by their holdings.

Second, I question the propriety of applying the "mixed contract" doctrine to contracts that are not concerned with goods and services, a legal premise upon which both *Novamedix* and *ITT* rely. Both cases applied the "mixed contract" doctrine, to contracts which involved, not the sale of goods and services, but the sale

of goods and the settlements of legal claims. While New Jersey courts have long employed the "predominant purpose" test in order to determine whether contracts for the sale of goods and services are covered by Article 2, *see e.g., Integrity Material Handling Sys., Inc. v. Deluxe Corp.,* 317 N.J.Super. 406, 412, 722 A.2d 552 (App.Div.1999); *Quality Guaranteed Roofing, Inc. v. Hoffmann–La Roche, Inc.,* 302 N.J.Super. 163, 166, 694 A.2d 1077 (App.Div.1997); *Meyers v. Henderson Const. Co.,* 147 N.J.Super. 77, 82, 370 A.2d 547 (Law Div.1977), they have never extended that doctrine to contracts which concern both the sale of goods and a settlement of legal claims.

Article 2 of the U.C.C. specifies only that "this Chapter applies to transactions in goods; ..." N.J. Stat. Ann. § 12A:2–201. The "mixed contract" doctrine, by contrast, grew out of the English common law where the Statute of Frauds required that contracts for goods, but not services, be in writing. *See* N.J. Stat. Ann. § 12A:2–201, cmt.; William R. Russell, Note, *Products and the Professional: Strict Liability in the Sale–Service Hybrid Transaction,* 24 Hastings L.J. 111, 113 (1972). Furthermore, "[i]t is well settled that a contract of exchange or barter was within the traditional Statute [of Frauds], and the same is true for contracts under the Uniform Commercial Code." 9 Samuel Williston, *Williston on Contracts* § 26:5 (4th ed.1999).

The letter agreement between Sara Lee and LCC more closely resembles a contract in which LCC's right to sue Sara Lee was "exchanged" for Sara Lee's provision of pantyhose, store displays and marketing assistance. Thus, the contract is more properly viewed as one clearly within the ambit of § 2–304 of the U.C.C., which, as codified in New Jersey, provides: "The price can be made payable in money or otherwise. If it is payable in whole or in part in goods each party is a seller of the good which he is to transfer." N.J. Stat. Ann. § 12A:2–304; *cf. Around the World Merchandisers, Inc. v. Rayovac Corp.,* 245 N.J.Super. 337, 342, 585 A.2d 437 (Law Div.1990)(if plaintiff was to be paid for his services as distributor and in restocking display cases by the transfer of goods from defendant, transaction would be subject to U.C.C. Statute of Frauds; "Services may constitute the price of goods" under § 2–204(a)). *Novamedix* and *ITT* summarily applied the "predominant purpose" test to the settlement contracts at issue, with little analysis of the history or purpose of the pertinent U.C.C. provisions, and no detailed discussion of the propriety or logic of its application to contracts involving the settlement of legal claims in exchange for a payment of goods.

Finally, it appears that the contracts which were the subjects of *Novamedix* and *ITT* can be distinguished from the settlement agreement in this case. *Novamedix* involved a contract which, *inter alia,* resolved a patent infringement suit between the parties. The contract provided that the defendant accused of infringement would: (1) admit its infringement and the validity of plaintiff's patents; (2) stop its infringement; (3) deliver its inventory of the infringing products and customer lists; (4) grant plaintiff an exclusive license under defendant's own patents; and, (5) pay monetary damages. *Novamedix,* 166 F.3d at 1179. The Court concluded that given the breadth of the remedies contained in the contract, to "elevate the inventory term over the other elements of consideration given by NDM is to distort the entire agreement through the lens of Novadmedix's asserted purpose of selling the inventory when it entered into the agreement." *Id.* at 1182.

In this case, the bulk of the letter agreement of July 7, 1995 which memorialized

the parties' understanding of the terms of their "settlement," details the provision of pantyhose, store displays, and marketing in order for the parties to "continue to do business in Lithuania, Latvia, Estonia [the Baltics] and the District of Kaliningrad [D.K.]." Pl.'s Ex. 99. It is only in the last paragraph of that two-page letter where LCC's release of legal claims against Sara Lee is discussed. *Id.* ("The above is accepted by LCC ..., as releasing and discharging Sara Lee Hosiery ... from any claim, demand, or cause of action LCC may have now or in the future growing out of any matter or dispute whatsoever related to any act or event occurring up to or through the date of this letter."). Unlike the contract in *Novamedix*, which contained many remedies to restore rightful ownership in a patent, the July 7, 1995 letter agreement consists of almost two full pages concerning the transfer of goods and supporting sales materials. Thus, focusing on the sale of goods aspect of the July 7, 1995 letter does not similarly unreasonably skew the purpose of the contract.

The contract at issue in *ITT* was a settlement of legal claims concerning the quality of goods supplied under a previous contract between the parties. The Court concluded that if it were to interpret the contract as one for the sale of goods, ITT would be protected by Article 2's express and implied warranties. Such a result, the Court reasoned, would contravene the intention of the parties to compromise on the exact issue of whether the goods were covered by implied warranties. *ITT*, 926 F.2d at 1266 ("As both parties were fully aware, the primary purpose of the May 6 agreement was to settle litigation regard-

ing precisely the issue of whether ITT had an obligation to provide cable assemblies which were fit for commercial use pursuant to an earlier contract for the sale of these goods.... In light of the parties' aim to settle this very issue, we doubt the May 6 agreement was a sale of goods within the purview of article two from which ITT could only exclude implied warranties by a conspicuous writing which mentions merchantability.").

Here, the July 7, 1995 letter agreement represented a compromise of legal claims concerning Sara Lee's alleged breach of an exclusive franchise agreement, which LCC claimed to possess for L'eggs pantyhose in Lithuania.[3] The dispute between LCC and Sara Lee did not concern the quality of the pantyhose supplied under that distribution agreement, and thus, unlike the contract in *ITT*, the issues of implied and express warranties under the U.C.C. were not implicated in the "settlement" reached by Sara Lee and LCC.

Therefore, I conclude that Sara Lee's motion for judgment as a matter of law on the ground that the July 7, 1995 letter agreement between it and LCC is not governed by Article 2 of the U.C.C. must be denied.

### F. Warranty of Fitness for a Particular Purpose

■ Sara Lee argues that it is entitled to judgment as a matter of law on LCC's claim under N.J. Stat. Ann. § 12A:2–315, because LCC has presented no evidence "that the Mexican pantyhose were to be used for any purpose other than the ordinary purpose for which pantyhose are

---

**3.** I granted Sara Lee's previous Rule 50 motion on LCC's claim under the New Jersey Franchise Practices Act, N.J. Stat. Ann. § 56:10–4, finding that "LCC has not presented sufficient evidence from which a jury could reasonably conclude that LCC maintained a place of business in New Jersey within the meaning of the [New Jersey Franchise Practices Act]." *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 23 F.Supp.2d 509, 519 (D.N.J.1998). LCC did not appeal that ruling.

used, namely to be worn by women in the course of their daily routines." Def.'s Br. at 38. Although LCC's argument is not a model of clarity on this point, it appears to argue that the fact that the pantyhose were to be worn by *Lithuanian* women suffices as a "particular purpose" to invoke the protection § 12A:2–315. Pl.'s Br. at 37–38.

Section 2–315 provides:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

N.J. Stat. Ann. § 12A:2–315. Comment 2 to that section provides guidance in distinguishing a "particular purpose" from an "ordinary purpose" which is covered under the general implied warranty of merchantability:

A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing a mountain.

*Id.* at cmt. 2.

Section 2–315 of New Jersey's version of the U.C.C. does not contemplate the imposition of additional liability on Sara Lee for allegedly knowing of the allegedly idiosyncratic attributes of some of LCC's Lithuanian customers. If the Mexican pantyhose failed to allow Lithuanian women to en-gage in their normal activities without having the pantyhose fall down, wear out, or bleed color, these are failings which are encompassed by the implied warranty of merchantability and do not trigger the protections of § 2–315. LCC has presented no evidence that the Mexican pantyhose were intended for any "special" use analogous to using shoes for mountain climbing that would give them the protection of § 2–315. Accordingly, Sara Lee's motion for judgment as a matter of law on LCC's claim under N.J. Stat. Ann. § 12A:2–315 shall be granted.

### G. Implied Covenant of Good Faith and Fair Dealing

In New Jersey, every contract carries with it the implied covenant of good faith and fair dealing. *Wade v. Kessler Inst.*, 172 N.J. 327, 340, 798 A.2d 1251 (2002). Sara Lee argues that it is entitled to judgment as a matter of law on LCC's claims that Sara Lee violated the covenant of good faith and fair dealing because LCC has failed to produce evidence of bad faith or intentions. Def.'s Br. at 39–40. Having concluded that LCC has produced evidence sufficient to pursue its claim for breach of contract and its claim for punitive damages, I also conclude that LCC has presented sufficient evidence to allow the jury to consider its claim against Sara Lee for breach of the implied covenant of good faith and fair dealing.

Accordingly, Sara Lee's motion for judgment as a matter of law on this ground shall be denied.

### IV. CONCLUSION

For the reasons set forth above, Sara Lee's Motion for Judgment as a Matter of Law, pursuant to Fed.R.Civ.P. 50(a), shall be granted on LCC's claim under N.J. Stat. Ann. § 12A:2–315, breach of warranty of fitness for a particular purpose, and

shall be denied in all other respects. The Court shall enter an appropriate form of Order.